**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
CIVIL DIVISION**

| | |
|---|---|
| ERIN SKALDE AND JARROD SKALDE, | : |
| | : |
| | : NO. |
| Plaintiffs, | : |
| | : |
| v. | : |
| | : Civil Action |
| LEMIEUX GROUP, L.P., | : |
| PITTSBURGH PENGUINS L.P., and | : **COMPLAINT** |
| CLARK DONATELLI, | : |
| | : JURY TRIAL DEMANDED |
| Defendants. | : |

## <u>INTRODUCTION</u>

This case involves a major professional hockey team, the defendant Pittsburgh Penguins, negligently retaining a known serial harasser, defendant Clark Donatelli, as a head coach, allowing him to harass and sexually assault numerous women including the plaintiff Erin Skalde, and then retaliating against Mrs. Skalde's husband, co-plaintiff Jarrod Skalde, after he reported the sexual assault. Mr. Skalde and Mrs. Skalde seek to be made whole under federal and state law for the emotional and economic harm they have suffered.

## PARTIES

1.      Erin Skalde resides in Niagara Falls, Ontario and is therefore a citizen of Canada.

2.      Jarrod Skalde, Mrs. Skalde's husband, resides with her in Niagara Falls, Ontario and is therefore also a citizen of Canada.

3.      The Pittsburgh Penguins, L.P., is a Pennsylvania limited partnership that operates the Pittsburgh Penguins professional hockey franchise of the National Hockey League (NHL), with its principal place of business in Pittsburgh, and is therefore a citizen of Pennsylvania.

4.       Lemieux Group, L.P., is a Pennsylvania limited partnership with its principal place of business in Pittsburgh, and owns and operates the Pittsburgh Penguins, and is therefore also a citizen of Pennsylvania.

5.      Clark Donatelli (Mr. Donatelli) is an adult individual who, upon information and belief, is a resident of Narragansett, Rhode Island, and therefore a citizen of Rhode Island.  At relevant times, Mr. Donatelli was the Head Coach for The Penguins' minor league affiliate, the Wilkes-Barre/Scranton Penguins, where he supervised Mr. Skalde and gained access to Mrs. Skalde for his sexual assault.

6.      In this Complaint, the Pittsburgh Penguins, L.P. and the Lemieux Group, L.P. may be collectively referenced as "The Pittsburgh Penguins" or "The Penguins."

## JURISDICTION AND VENUE

7.      This Court has diversity jurisdiction over the action pursuant to 28 U.S.C. § 1332(a)(2), as the plaintiffs are citizens of Canada and the defendants are citizens of Pennsylvania and Rhode Island, and the plaintiffs seek damages in an amount that exceeds $75,000.

8.      This Court has personal jurisdiction over the two corporate defendants because the Pittsburgh Penguins, L.P. and Lemieux Group L.P. carry on a continuous and systematic part of their general businesses within the Commonwealth by operating both a major league and a minor league hockey team and other business operations in Pennsylvania.

9.      The Court has personal jurisdiction over Mr. Donatelli because of his ongoing transactions and employment in this Commonwealth, from which the actions in this Complaint arose, and by causing harm or tortious injury in this Commonwealth by an act or omission outside this Commonwealth.

10.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

## **FACTUAL ALLEGATIONS**

11.    Mr. Skalde played professional ice hockey for 17 years, including stints with several NHL teams, and has coached at the professional level since 2007.

12.    In 2013, Mr. Skalde was selected as the East Coast Hockey League's (ECHL) John Brophy Coach of the Year Award winner.

13.    In the summer of 2017, The Penguins hired Mr. Skalde as a player development coach.

14.    In recognition of Mr. Skalde's work ethic, professionalism, and ability to coach and develop talent, The Penguins promoted him to assistant coach of the Wilkes-Barre/Scranton Penguins, its American Hockey League (AHL) affiliate, in 2018 after just one season with The Penguins.

15.    In this position, Mr. Skalde reported to Mr. Donatelli, who was head coach of the Wilkes-Barre/Scranton Penguins and had been in that position for several years.

16.    The Penguins regularly receive state and local funding to support their hockey operations, including through the Sports & Exhibition Authority of Pittsburgh, a state entity which owns and operates PPG Paints Arena, the venue where The Penguins play their home games.

17.     Through this arrangement, and in consideration of the public benefit conferred upon it, the Commonwealth paid The Penguins approximately $6,000,000 in pre-development costs for the construction of PPG Paints Arena, plus a lump sum of $2,000,000 in public funds.

18.     In addition, on an ongoing basis the Commonwealth subsidizes The Penguins by allowing it to receive all revenues from all events held at the publicly owned venue.

19.     On information and belief, The Penguins also receive other public funding and subsidies in relation to its operation of professional hockey teams.

20.     The Wilkes-Barre/Scranton Penguins also receive substantial state subsidies and funding through the Luzerne County Convention Center Authority, a state-created entity, which owns and operates Mohegan Sun Arena where the Wilkes-Barre/Scranton Penguins play its home games.

## SEXUAL ASSAULT AND BATTERY

21.     The Wilkes-Barre/Scranton Penguins routinely travel to other cities and across state lines in order to play professional hockey games.

22.     During the hockey season, Mr. Donatelli and Mr. Skalde, as coaches, would travel with the team.  Players and coaches often brought their significant others and families on the road to support the team, which The Penguins encouraged and promoted by arranging for free tickets and providing other benefits

for these family members.  As a result, Mr. Skalde would bring his wife, Mrs. Skalde, to some of these out-of-town games.

23.     As part of those games and travels, Mr. Donatelli would encourage Mr. Skalde and Mrs. Skalde to join him for dinner and drinks, where he would often continue to discuss coaching duties and responsibilities.  Mr. Donatelli intended such dinners and socializing to be part of the job and necessary to maintain good relations between the head coach and his subordinate, and Mr. Skalde knew and understood that such activities were part of the job.

24.     On or about November 11, 2018, after a road game in Providence, Rhode Island, Mr. Donatelli invited Mr. Skalde and Mrs. Skalde to join him for dinner.

25.     After the evening out, and on the way back to the hotel, Mr. Skalde stepped away from Mr. Donatelli and Mrs. Skalde for a few minutes to arrange a ride back to the team hotel.

26.     Once Mr. Donatelli was alone with Mrs. Skalde, he began to make unwelcome sexual advances and physical contact with Mrs. Skalde.  He put his arm around Mrs. Skalde, called her "sexy," and pulled her close to him.

27.     Mrs. Skalde tried to fight off his sexual advances and told him to stop, but to no avail, as Mr. Donatelli escalated his attack, including reaching his hands into Mrs. Skalde's  shirt and repeatedly touching her breasts.  He also tried to reach

his hands into her pants.  Mrs. Skalde tried to pull away and kept telling Mr.

Donatelli to stop.  She was in complete shock and began crying.

28.    Mr. Skalde was not present when this first attack occurred and, not

aware that it had happened, he returned shortly thereafter with the car-ride service

to take them back to their hotel.  Upon Mr. Skalde rejoining them, Mr. Donatelli

insisted that he (Mr. Donatelli) sit in the back seat with Mrs. Skalde for the ride,

and that Mr. Skalde sit in the front seat.

29.    Not realizing the impropriety of Mr. Donatelli's actions or intentions,

Mr. Skalde encouraged his wife to get in the back seat with Mr. Donatelli, per Mr.

Donatelli's request, despite her resistance and objections, which Mr. Skalde did not

understand.

30.    Still in shock and uncertain what to do in response to her husband's

boss sexually assaulting her, Mrs. Skalde fearfully entered the backseat of the car,

trying to put as much distance between herself and Mr. Donatelli as she could, to

avoid him again sexually touching her.

31.    Mr. Donatelli resumed his sexual assault and battery of Mrs. Skalde

once he had her in the darkness of the backseat.  He not only groped her breasts

again, but also forced his hands down her pants and touched her vagina, despite her

efforts to push him away.

32.    Mrs. Skalde was in shock and began crying again.

33.     These attacks caused her severe emotional and physical injuries, pain and distress.

34.     Only later did Mr. Skalde find out what happened to his wife that night, shaking him to the core to learn that he had sat unknowingly in the front seat as his boss had sexually assaulted his wife.

## DONATELLLI WAS A SERIAL OFFENDER

35.     This was not an isolated incident for Mr. Donatelli, as he had previously engaged in similar conduct in Charlotte, North Carolina, when he and his staff were asked to leave a local restaurant after Mr. Donatelli uttered obscenities at and engaged in lewd and aggressive behavior toward two women.

36.     In another episode, at a social gathering in a Wilkes-Barre/Scranton bar in November 2018, Mr. Donatelli sexually assaulted a friend of the Skaldes who was visiting from out of town, pulling up her shirt and trying to grope her breasts.  When the incident was reported to Michele Donatelli, Mr. Donatelli's wife, she responded with words to the effect of "That's just Clark being Clark."

37.     Mr. Skalde also became aware of reports of countless other episodes of inappropriate conduct by Mr. Donatelli, sexual and otherwise, which apparently The Penguins were aware of but did little or nothing to stop.

38.     Mr. Donatelli's misconduct, on information and belief, was well-known by The Penguins' management, but tolerated because he was a successful coach.

## MISCONDUCT REPORTED, DENIALS AND COVER-UP FOLLOW

39.     Mr. Skalde and Mrs. Skalde did not immediately report Mr. Donatelli's sexual assault because they had never experienced such an attack and were unsure what to do.  It was obviously embarrassing and traumatic to Mrs. Skalde.  The Skaldes also were concerned that reporting the conduct could lead to retaliation and create a crisis for the Wilkes-Barre/Scranton Penguins in the middle of the season, causing harm to the team and its players through no fault of the Skaldes.

40.     On May 15, 2019, Mr. Skalde confronted Mr. Donatelli about the sexual assault of his wife and his similarly unacceptable behavior toward other women.

41.     Mr. Donatelli claimed he was too drunk to remember the events of the night in question, but six days later Mr. Donatelli met with Mr. Skalde and apologized for his conduct.  Thereafter, Mrs. Skalde admirably gathered the strength to confront Mr. Donatelli about the sexual assault.  Mr. Donatelli pledged to Mr. and Mrs. Skalde that he would change his ways, seek help, and come

forward to The Penguins' Assistant General Manager Billy Guerin with what he had done.

42.     After Mr. Donatelli failed to follow through with his commitments, Mr. Skalde reported Mr. Donatelli's conduct to Mr. Guerin at the NHL draft in Vancouver, British Columbia on June 21, 2019.

43.     In response, Mr. Guerin assured Mr. Skalde that he would take care of the situation.

44.     Meanwhile, Mrs. Skalde continued to struggle with the emotional trauma from the sexual assault and consulted a psychologist.

45.     The fallout extended to Mr. Skalde and Mrs. Skalde's relationship and family life, causing extended and substantial harm and suffering.

## INVESTIGATION OF THE COMPLAINT AND FOLLOWED BY UNEQUAL TREATMENT AND RETALIATION

46.     On June 25, 2019, Mr. Skalde met with an in-house attorney for The Penguins to discuss the sexual assault Mr. Donatelli committed against his wife, as well as other similar instances of Mr. Donatelli's misconduct.  Mr. Skalde made clear that his wife continued to suffer from the assault and needed help and counseling.

47.     At the conclusion of the interview, Mr. Skalde was asked whether he feared he would lose his job as a result of reporting Mr. Donatelli's conduct, and he answered that, "yes," he did have that fear.

48.     Despite Mr. Skalde's concerns of reprisal, The Penguins did not give him any assurance that his job was safe or that he would not suffer retaliation as a result of making this complaint.

49.     The Penguins never contacted Mrs. Skalde to interview her about what had happened, apologize for the assault by its coach, or provide any expression of support or remorse.

50.     Instead, The Penguins continued to require Mr. Skalde to work with his wife's assailant as the investigation continued.

51.     Fueling Mr. Skalde's anxiety, The Penguins failed to apprise him of who within the organization was aware of Mr. Donatelli's transgressions or the status of the investigation, despite promises from The Penguins that the investigator would do so.

52.     Mr. Guerin later advised Mr. Skalde that The Penguins were terminating Mr. Donatelli's employment, but instructed him that knowledge of the incident and termination had to be suppressed, cautioning that it "has to stay quiet and can't be let out."

53.     Following the investigation, The Penguins did not address the sexual assault as an organization, arrange for sexual harassment training for its employees, apologize to Mr. Skalde, or otherwise take measures to address the harm caused or ensure that the toxic environment would be remediated.

54.     Mr. Skalde began to suffer retaliation as the new 2019-2020 AHL season started two months later.  In September, The Penguins stripped Mr. Skalde of his power play duties, which were among the most important aspects of his job. No explanation was provided.  The other assistant coach did not experience a similar reduction in his responsibilities.

55.     In addition, the other assistant coach and the new head coach, Mike Vellucci, received new computers from The Penguins, while Mr. Skalde was the only coach left with an old and outdated one.

56.     Despite this disparate treatment, Mr. Skalde continued his superb performance through the premature end of the AHL season due to the Covid-19 pandemic – and did so without complaint.

57.     In fact, Mr. Skalde earned praise from Mr. Vellucci, who told him he had a great season and he wished to retain him as an assistant coach for the following season.

## **TERMINATION OF EMPLOYMENT**

58.     Just two months later on May 5, 2020, The Penguins called Mr. Skalde to inform him that his position was being eliminated due to cutbacks necessitated by the Covid-19 pandemic, explaining that the decision was not performance-based.  Shortly thereafter, he was told he might be retained and transferred to another coaching position as set forth below.

59.     The Penguins' home office selected Mr. Skalde for its reduction in force, even though Mr. Skalde had more coaching experience than the other assistant coach at Wilkes-Barre/Scranton, J.D. Forrest, whom The Penguins not only retained, but months later promoted to head coach of the Wilkes-Barre/Scranton Penguins.

60.     Of the 21 employees handling hockey operations for The Penguins, team management selected only Mr. Skalde for termination – and told him it had nothing to do with his performance, which was "great."  But, of course, Mr. Skalde also happened to be the only one who had complained about the unlawful sexual assault and battery of his wife by a Penguins' coach.

61.     About one week later, Mr. Vellucci called Mr. Skalde to gauge his interest in taking the head coaching position for The Penguins' ECHL affiliate, the Wheeling Nailers, a team that competes on a lower professional tier than the Wilkes-Barre/Scranton Penguins.  Mr. Skalde told Mr. Vellucci that he was interested in the opportunity.

62.     Mr. Skalde was eminently qualified for the job, having won ECHL Coach of the Year honors in 2013.

63.     When Mr. Skalde contacted The Penguins' Assistant General Manager Jason Karmanos concerning the opportunity, Mr. Karmanos said only that he would put Mr. Skalde's "name in the hat" for the job.  This contrasted with

The Penguins' established practice of preferring in-house candidates and placing successful members of the coaching staff into available openings without requiring them to interview or compete with outside candidates.

64.     On May 27, 2020, Mr. Skalde was formally interviewed by The Penguins for the Nailers head coaching position.  Despite reports from some in the Penguins' organization that he had done well in the interview and should be selected, The Penguins refused to place him in the new job.

65.     Instead, The Penguins selected an outside candidate who had been coaching in Europe and had no experience with or knowledge of The Penguins culture and organization.

66.     The Penguins later promoted Mr. Vellucci to a position with the NHL team in Pittsburgh and promoted Mr. Forrest to head coach of the AHL team, but refused to recall Mr. Skalde and offer him the remaining assistant coach vacancy despite his qualifications for the position.  With both promotions, The Penguins touted their experience with and knowledge of the organization as a key to their promotions, in contrast to the treatment of Mr. Skalde.

67.     On information and belief, The Penguins knew before firing Mr. Skalde that they intended to promote Mr. Vellucci and Mr. Forrest, which would have left Mr. Skalde in his position as an assistant coach in Wilkes-Barre/Scranton.

Nevertheless, The Penguins created a pretext to fire Mr. Skalde first, and in retaliation for reporting the assault on his wife.

### COUNT I
### ASSAULT
### ERIN SKALDE v. CLARKE DONATELLI

68.   Plaintiff Erin Skalde re-alleges and incorporates by reference all allegations in the preceding paragraphs.

69.   Mr. Donatelli acted with the intent of putting Mrs. Skalde in apprehension of imminent harm and offensive bodily contact when he reached out to touch her after she resisted his sexual harassment, pulling her close to him, as well as when he moved his hands toward Mrs. Skalde's private parts on several occasions on the evening of November 11, 2018, as summarized above.

70.   As Mr. Donatelli intended, Mrs. Skalde did experience apprehension of imminent harm and offensive bodily contact.

71.   As a direct and proximate cause of Mr. Donatelli's actions, Mrs. Skalde has suffered and will continue to suffer physical and emotional pain, mental distress, and loss of enjoyment of life.

### COUNT II
### BATTERY
### ERIN SKALDE v. CLARKE DONATELLI

72.   Plaintiff Erin Skalde re-alleges and incorporates by reference all allegations in the preceding paragraphs.

73.    Mr. Donatelli caused an unwanted, offensive physical contact when, without Mrs. Skalde's consent, he engaged in the contact summarized above, pulled her close despite her resistance and telling him to stop, and groped her sexually, causing her injury, on the evening of November 11, 2018, as summarized above.

74.    As a direct and proximate cause of Mr. Donatelli's actions, Mrs. Skalde has suffered and will continue to suffer physical and emotional pain, mental distress, and loss of enjoyment of life.

## COUNT III
## NEGLIGENT RETENTION OF AN EMPLOYEE
## ERIN SKALDE v. PITTSBURGH PENGUINS

75.    Plaintiff Erin Skalde re-alleges and incorporates by reference all allegations in the preceding paragraphs.

76.    The Penguins were on notice of Mr. Donatelli's inappropriate and dangerous conduct toward women through numerous previous encounters between Mr. Donatelli and other friends, family members and staff at the Wilkes-Barre/Scranton Penguins.

77.    This inappropriate conduct included sexually assaulting other women, making crude and physical sexual advances on women while working for The Penguins, having sexual relations with lower-level staff at Mohegan Sun Arena,

becoming intoxicated and assaultive while attending events and road trips for The Penguins, and using drugs and alcohol while working for The Penguins.

78.    The Penguins were fully aware of this conduct, and that it put others, especially women, at high risk of being sexually assaulted by him, but continued to tolerate it and took no action to protect employees, family members or others who came in contact with Mr. Donatelli through his powerful position as a head coach for The Penguins.

79.    The sexual assault and battery that Mrs. Skalde suffered was reasonably foreseeable due to Mr. Donatelli's repeated conduct along these lines.

80.    Mr. Donatelli was acting in the scope of his employment as head coach of the Wilkes-Barre/Scranton Penguins when he committed the sexual assault of Mrs. Skalde because it occurred while on a road trip with his team and coaching staff, in which post-game dinners with the head coach were part of the job.

81.    The assault occurred within the authorized time and space limits of Mr. Donatelli's employment because it took place during a social gathering while the team was on a road trip, which Mrs. Skalde attended in support of her husband and the team, as is custom for the families of coaches and players and was encouraged by The Penguins by arranging for free tickets and other benefits for

family members.  The team plays away from home 38 times per season, and families are encouraged to join the coaches on such trips.

82.    Mr. Donatelli's attendance at the team outing was actuated to serve The Penguins because, as the head coach of the Wilkes-Barre/Scranton Penguins, the gathering was intended for the coaching staff to share information and bond together, with the inclusion of family members to strengthen those professional bonds.

83.    Because the Penguins knew about and tolerated Mr. Donatelli's lewd and inappropriate behavior around women, his sexual assault of Mrs. Skalde was foreseeable and not in any way unexpected.

84.    As a result of Defendants' negligent retention of Mr. Donatelli, Mrs. Skalde has suffered and will continue to suffer substantial damages and harm, including without limitation, emotional distress with physical manifestations, loss of enjoyment of life, and damage to her reputation and career.

**COUNT IV**
**PENNSYLVANIA WHISTLEBLOWER LAW**
**JARROD SKALDE v. PITTSBURGH PENGUINS**

85.    Plaintiff Jarrod Skalde re-alleges and incorporates by reference all allegations in the preceding paragraphs.

86.    The Penguins are a limited partnership that receives money from a public body to provide services in the Commonwealth and is therefore a covered employer under the law.

87.    Mr. Skalde reported, in good faith, the unlawful conduct of an employee of The Penguins organization when he complained to a supervisory employee, Mr. Guerin, about Mr. Donatelli's sexual assault and battery of Mrs. Skalde, as set forth more fully above.

88.    The Penguins retaliated against Mr. Skalde for reporting this unlawful conduct by shunning him and his wife, providing him with unequal treatment and reducing his duties as a coach, and then terminating him, as summarized above.

89.    The Penguins justified the organization's one-man reduction in force under the pretext of staffing cutbacks in light of the Covid-19 pandemic, despite retaining all other Hockey Operations employees at the time, none of whom made a complaint of unlawful and criminal conduct to management.

90.    Despite a strong recommendation from Mr. Vellucci for an ECHL head coaching position and The Penguins' well-established preference to promote from within the organization, Penguins' management selected an external candidate with no internal knowledge of the organization for the Wheeling job and fired Mr. Skalde.

91.     As a result of Defendants' retaliation, Mr. Skalde has suffered and will continue to suffer substantial damages and harm, including without limitation, loss of wages and benefits, loss of future earning power, emotional distress, loss of enjoyment of life, damage to his reputation and career, and attorneys' fees and costs.

**COUNT V**
**LOSS OF CONSORTIUM**
**JARROD SKALDE v. PITTSBURGH PENGUINS**

92.     Plaintiff Jarrod Skalde re-alleges and incorporates by reference all allegations in the preceding paragraphs.

93.     Mr. Skalde and Mrs. Skalde were married at the time Mr. Donatelli sexually assaulted Ms. Skalde.

94.     Mrs. Skalde suffered and continues to suffer long-running emotional harm and pain as a result of Mr. Donatelli's assault and battery of her, and the way The Penguins treated her and her husband thereafter.

95.     Mrs. Skalde's emotional distress damaged Mr. Skalde's marital expectations as evidenced by a change in Mrs. Skalde's behavior around their family and other tremendous strains on their marriage.

96.     As a direct and proximate cause of Mr. Donatelli's physical and sexual assault and battery of Mrs. Skalde, and The Penguins' response thereto, Mr.

Skalde has suffered and will continue to suffer a loss of consortium with his wife, emotional pain and mental distress, and loss of enjoyment of life.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Erin Skalde and Jarrod Skalde request the following relief:

A.   An award of damages against Mr. Donatelli and The Penguins to Mrs. Skalde for physical and emotional pain and mental suffering, loss of enjoyment of life, costs of medical and psychological care, and loss of income;

B.   A judgment declaring that The Penguins violated Mr. Skalde's rights under the Pennsylvania Whistleblower Law;

C.   An award of damages to Mr. Skalde for his lost wages and benefits (back pay and front pay), loss of earning power, emotional distress damages, damage to his reputation, and loss of enjoyment of life as the result of the defendants' actions;

D.   An award of punitive damages against each of the defendants for their willful violation of the law;

E.   An award of Mrs. Skalde's and Mr. Skalde's fees and costs in this action,

including without limitation their reasonable attorneys' fees and costs;

F.      An award of pre-judgment and post-judgment interest; and

G.      Such other relief as the Court deems just and appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial on all causes of action and claims so triable.

HOMANS PECK, LLC


By:   *s/Michael D. Homans*
      Michael D. Homans (Attorney I.D. #
      76624)
      134 North Wayne Ave.
      Wayne, PA 19087
      (215) 419-7477
Dated:  November 3, 2020        *Attorneys for Plaintiffs Erin Skalde and Jarrod Skalde*