**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
CIVIL DIVISION**

| | |
|---|---|
| ERIN SKALDE AND JARROD SKALDE, | : |
| | : |
| | : |
| Plaintiffs, | : NO. 3:20-cv-02039-JPW |
| | : |
| v. | : Hon. Jennifer P. Wilson |
| | : |
| LEMIEUX GROUP, L.P., | : |
| PITTSBURGH PENGUINS L.P., and | : |
| CLARK DONATELLI, | : |
| | : JURY TRIAL DEMANDED |
| Defendants. | : |

## **FIRST AMENDED COMPLAINT**

## **INTRODUCTION**

This case involves a major professional hockey team, the defendant Pittsburgh Penguins, negligently retaining a known serial harasser, defendant Clark Donatelli, as a head coach, allowing him to harass and sexually assault numerous women including the plaintiff Erin Skalde. The Penguins then retaliated against Mrs. Skalde's husband, co-plaintiff Jarrod Skalde, who was an assistant head coach with The Penguins, after he reported the sexual assault.  Mr. Skalde and Mrs. Skalde seek to be made whole under federal and state law for the emotional and economic harm they have suffered.

## PARTIES

1.     Erin Skalde resides in Niagara Falls, Ontario and is therefore a citizen of Canada.

2.     Jarrod Skalde, Mrs. Skalde's husband, resides with her in Niagara Falls, Ontario and is therefore also a citizen of Canada.

3.     The Pittsburgh Penguins, L.P., is a Pennsylvania limited partnership that operates the Pittsburgh Penguins professional hockey franchise of the National Hockey League (NHL), with its principal place of business in Pittsburgh, and is therefore a citizen of Pennsylvania.

4.     The Lemieux Group, L.P., is a Pennsylvania limited partnership with its principal place of business in Pittsburgh, and owns and operates the Pittsburgh Penguins, and is therefore also a citizen of Pennsylvania.

5.     Clark Donatelli is an adult individual who, upon information and belief, is a resident of Narragansett, Rhode Island, and therefore a citizen of Rhode Island.  At relevant times, Mr. Donatelli was the Head Coach for The Penguins' minor league affiliate, the Wilkes-Barre/Scranton Penguins, where he supervised Mr. Skalde and gained access to Mrs. Skalde for his sexual assault.

6.     The Pittsburgh Penguins, L.P. and the Lemieux Group, L.P. were a single, joint and integrated employer of Mr. Skalde, with unity of ownership, management, and business functions between the two entities, and the Lemieux

Group provided Mr. Skalde's employee benefits and other labor-management functions.  The two entities are collectively referenced herein as "The Pittsburgh Penguins" or "The Penguins".

## JURISDICTION AND VENUE

7.     This Court has diversity jurisdiction over the action pursuant to 28 U.S.C. § 1332(a)(2), as the plaintiffs are citizens of Canada and the defendants are citizens of Pennsylvania and Rhode Island, and the plaintiffs seek damages in an amount that exceeds $75,000.

8.     This Court has personal jurisdiction over the two corporate defendants because the Pittsburgh Penguins, L.P. and Lemieux Group L.P. carry on a continuous and systematic part of their general business within the Commonwealth by operating both a major league and a minor league hockey team and other business operations in Pennsylvania, and by soliciting and accepting public funds in order to provide sports entertainment, parking and other services to the public in Pennsylvania.

9.     The Court has personal jurisdiction over Mr. Donatelli because of his ongoing transactions and employment in this Commonwealth, from which the actions in this Complaint arose, and by causing harm or tortious injury in this Commonwealth by an act or omission outside this Commonwealth.

3

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

11.     Mr. Skalde played professional ice hockey for 17 years, including stints with several NHL teams, and has coached at the professional level since 2007.

12.     In 2013, Mr. Skalde was selected as the East Coast Hockey League's (ECHL) John Brophy Coach of the Year Award winner.

13.     In the summer of 2017, The Penguins hired Mr. Skalde as a player development coach.

14.     In recognition of Mr. Skalde's work ethic, professionalism, and ability to coach and develop talent, The Penguins promoted him to assistant coach of the Wilkes-Barre/Scranton Penguins, its American Hockey League (AHL) affiliate, in 2018 after just one season with The Penguins.

15.     In this position, Mr. Skalde reported to Mr. Donatelli, who was head coach of the Wilkes-Barre/Scranton Penguins and had been in that position for several years.

16.     The Penguins regularly receive state and local funding to support their hockey operations, including through the Sports & Exhibition Authority of

Pittsburgh ("SEA"), a state-created entity whose purpose is to provide educational, cultural, physical, civic and social events for the benefit for the general public.

17.     Through this arrangement, and in consideration of the public benefit conferred upon it, the Commonwealth paid The Penguins approximately $6,000,000 in pre-development costs for the construction of PPG Paints Arena, plus a lump sum of $2,000,000 in additional public funds.

18.     Also as part of this arrangement, the SEA imposes a surcharge on the public for parking at events hosted by PPG Paints Arena, the proceeds of which are paid, in part, to The Penguins for the public service of providing Pittsburgh with a professional hockey franchise, sports and entertainment to the public, and the related tax revenues and economic development.

19.     In addition, on an ongoing basis the Commonwealth subsidizes The Penguins by allowing it to receive all revenues from all events held at the publicly owned venue, for the public purpose of economically supporting and keeping the Penguins in Pittsburgh (The Penguins had threatened to move to other cities prior to receiving the public funding).

20.     On information and belief, The Penguins also receive other public funding and subsidies in relation to its operation of professional hockey teams.

21.     The Wilkes-Barre/Scranton Penguins also receive substantial state subsidies and funding through the Luzerne County Convention Center Authority, a

state-created entity, which owns and operates Mohegan Sun Arena where the

Wilkes-Barre/Scranton Penguins play its home games.  This funding is provided

for the public service of providing the Wilkes-Barre/Scranton area with a

professional hockey franchise, sports and entertainment for the public, and related

tax revenues and economic development.

## <u>SEXUAL ASSAULT AND BATTERY</u>

22.     The Wilkes-Barre/Scranton Penguins routinely travel to other cities

and across state lines in order to play professional hockey games.

23.     During the hockey season, Mr. Donatelli and Mr. Skalde, as coaches,

would travel with the team.  In an effort to engage its employees and promote team

bonding and esprit de corps, The Penguins had a policy and practice of

encouraging players and coaches to bring their significant others and families on

the road to support the team, for which The Penguins provided free tickets and

other benefits for these family members.  As a result, Mr. Skalde would bring his

wife, Mrs. Skalde, to some of these out-of-town games.

24.     In fact, The Penguins were known for their overindulgence with

employees when it came to covering expenses incurred on the road, as

management routinely paid for extravagant dinners and outings where alcohol

flowed freely. These dinners and nights out could sometimes cost thousands of

dollars, whereas other NHL teams provided their employees with only a modest per diem.

25.     In relation to home games, road games and travels, The Penguins would encourage and support coaches, including Mr. Donatelli, taking out assistant coaches, other employees and their family members for dinner and drinks after hockey games. At these after-game activities the coaches, employees and family members would often continue to discuss coaching duties and responsibilities, as well as build stronger personal relationships, all of which The Penguins promoted as part of the job.

26.     Importantly, The Penguins approved and paid for alcohol consumption during these activities.

27.     Consistent with this policy and practice of The Penguins, Mr. Donatelli would encourage Mr. Skalde and Mrs. Skalde to join him for dinner and drinks after games, usually expensed to and paid for by The Penguins. The Penguins and Mr. Donatelli intended such dinners and socializing to be part of the job and necessary to maintain good relations and communications between the head coach and his subordinate, and Mr. Skalde knew and understood that such activities were part of the job.

28.     On or about November 11, 2018, after a road game in Providence, Rhode Island, Mr. Donatelli invited Mr. Skalde and Mrs. Skalde to join him for dinner and, as usual and expected, they discussed issues relating to The Penguins.

29.     After the evening out, and on the way back to the hotel, Mr. Skalde stepped away from Mr. Donatelli and Mrs. Skalde for a few minutes to arrange a ride back to the team hotel (also paid for by The Penguins).

30.     Once Mr. Donatelli was alone with Mrs. Skalde, he began to make unwelcome sexual advances and physical contact with her.  He put his arm around Mrs. Skalde, called her "sexy," and pulled her close to him.

31.     Mrs. Skalde tried to fight off his sexual advances and told him to stop, but to no avail, as Mr. Donatelli escalated his attack, including reaching his hands into Mrs. Skalde's shirt and repeatedly touching her breasts.  He also tried to reach his hands into her pants.  Mrs. Skalde tried to pull away and kept telling Mr. Donatelli to stop.  She was in complete shock at this harassment and assault by her husband's boss and began crying.

32.      Mr. Skalde was not present when this first attack occurred and, not aware that it had happened, he returned shortly thereafter with the car-ride service to take them back to their hotel.  Upon Mr. Skalde rejoining them, Mr. Donatelli insisted that he (Mr. Donatelli) sit in the back seat with Mrs. Skalde for the ride, and that Mr. Skalde sit in the front seat.

33.     Not realizing the impropriety of Mr. Donatelli's actions or intentions, Mr. Skalde encouraged his wife to get in the back seat with Mr. Donatelli, per Mr. Donatelli's request, despite her resistance and objections, which Mr. Skalde did not understand.

34.     Still in shock and uncertain what to do in response to her husband's boss sexually assaulting her, Mrs. Skalde fearfully entered the backseat of the car, trying to put as much distance between herself and Mr. Donatelli as she could, to avoid him again sexually touching her.

35.     Mr. Donatelli resumed his sexual assault and battery of Mrs. Skalde once he had her in the darkness of the backseat.  He not only groped her breasts again, but also forced his hands down her pants and touched her vagina, despite her efforts to push him away.

36.     Mrs. Skalde was in shock and began crying again.

37.     These attacks caused her severe emotional and physical injuries, pain and distress.

38.     Only later did Mr. Skalde find out what happened to his wife that night, shaking him to the core to learn that he had sat unknowingly in the front seat as his boss had sexually assaulted his wife.  The attack was all the more galling because Mr. Donatelli used his superior position as Mr. Skalde's supervisor with The Penguins to prey upon Mrs. Skalde.

## DONATELLLI WAS A SERIAL OFFENDER

39.     This was not an isolated incident for Mr. Donatelli, as he had

previously engaged in similar conduct with The Penguins in Charlotte, North

Carolina, when he and his staff were asked to leave a local restaurant after Mr.

Donatelli uttered obscenities at and engaged in lewd and aggressive behavior and

harassment toward two women.

40.     In another episode, at a social gathering in a Wilkes-Barre/Scranton

bar in November 2018, Mr. Donatelli sexually assaulted a friend of the Skaldes

who was visiting from out of town, pulling up her shirt and trying to grope her

breasts.  When the incident was reported to Mr. Donatelli's wife, she responded

with words to the effect of "That's just Clark being Clark."

41.     Mr. Skalde also became aware of reports of countless other episodes

of inappropriate conduct by Mr. Donatelli, sexual and otherwise, which apparently

The Penguins were aware of and did little or nothing to stop.

42.     On information and belief, Mr. Donatelli also preyed on and had

sexual relations with female lower-level staff at Mohegan Sun Arena, brought sex

workers to his hotel room on team road trips, and routinely used drugs and alcohol

while working for The Penguins.

43.     Mr. Donatelli's misconduct, on information and belief, was well-

known by The Penguins' management, but tolerated because he was a successful

coach.  The Penguins seemed to take an "anything goes" attitude when it came to management activities after games.

## MISCONDUCT REPORTED, DENIALS AND COVER-UP FOLLOW

44.    Mr. Skalde and Mrs. Skalde did not immediately report Mr. Donatelli's sexual assault because they had never experienced such an attack and were unsure what to do.  It was obviously embarrassing and traumatic to Mrs. Skalde.  The Skaldes also were concerned that reporting the conduct could lead to retaliation and create a crisis for the Wilkes-Barre/Scranton Penguins in the middle of the season, causing harm to the team and its players through no fault of the Skaldes.

45.    On May 15, 2019, after the season was over, Mr. Skalde confronted Mr. Donatelli about the sexual assault of his wife and his similarly unacceptable behavior toward other women.

46.    Mr. Donatelli claimed he was too drunk to remember the events of the night in question, but six days later Mr. Donatelli met with Mr. Skalde and apologized for his conduct.  Thereafter, Mrs. Skalde admirably gathered the strength to confront Mr. Donatelli about the sexual assault.  Mr. Donatelli pledged to Mr. and Mrs. Skalde that he would change his ways, seek help, and come forward to The Penguins' Assistant General Manager Billy Guerin with what he had done.

47.     As Mr. Skalde's supervisor and a top manager of the Wilkes-Barre/Scranton Penguins, Mr. Donatelli was a senior executive for The Penguins at the location and had a duty to report the issue and complaint to Human Resources with The Penguins, but did not.

48.     After Mr. Donatelli failed to follow through with his commitments, Mr. Skalde reported Mr. Donatelli's conduct to Mr. Guerin at the NHL draft in Vancouver, British Columbia on June 21, 2019.

49.     In response, Mr. Guerin assured Mr. Skalde that he would take care of the situation.

50.     Meanwhile, Mrs. Skalde continued to struggle with the emotional trauma from the sexual assault and consulted a psychologist.

51.     The fallout extended to Mr. Skalde and Mrs. Skalde's relationship and family life, causing extended and substantial harm and suffering.

## <u>INVESTIGATION OF THE COMPLAINT FOLLOWED BY UNEQUAL TREATMENT AND RETALIATION</u>

52.     On June 25, 2019, Mr. Skalde met with an in-house attorney for The Penguins to discuss the sexual assault Mr. Donatelli committed against his wife, as well as other similar instances of Mr. Donatelli's misconduct.  Mr. Skalde made clear that his wife continued to suffer from the assault and needed help and counseling.

53.     At the conclusion of the interview, Mr. Skalde was asked whether he feared he would lose his job as a result of reporting Mr. Donatelli's conduct, and he answered that, "yes," he did have that fear.

54.     Despite Mr. Skalde's concerns of reprisal, The Penguins did not give him any assurance that his job was safe or that he would not suffer retaliation as a result of making this complaint.

55.     The Penguins never contacted Mrs. Skalde to interview her about what had happened, apologize for the assault by its coach, or provide any expression of support or remorse.

56.     Instead, The Penguins continued to require Mr. Skalde to work with his wife's assailant as the investigation continued.

57.     Fueling Mr. Skalde's anxiety, The Penguins failed to apprise him of who within the organization was aware of Mr. Donatelli's transgressions or the status of the investigation, despite promises from The Penguins that the investigator would do so.

58.     Mr. Guerin later advised Mr. Skalde that The Penguins were terminating Mr. Donatelli's employment, but instructed him that knowledge of the incident and termination had to be suppressed, cautioning that it "has to stay quiet and can't be let out."

59.    The Penguins reported the separation of Mr. Donatelli to the public as a voluntary resignation for personal reasons, allegedly following multiple discussions over a period of time, and never disclosed that their coach had assaulted an employee's wife during a Penguins road-trip. To this day, the Skaldes are not sure whether The Penguins actually fired Mr. Donatelli or let him off easily with the chance to resign, despite his sexual assault of an employee's wife while on a Penguins business trip.

60.    Following the investigation, The Penguins did not address the sexual assault as an organization, arrange for sexual harassment training for its employees, apologize to Mr. Skalde, or otherwise take measures to address or correct the harm caused or to ensure that the toxic environment would end.

61.    Mr. Skalde began to suffer retaliation as the new 2019-2020 AHL season started two months later.  In September, The Penguins stripped Mr. Skalde of his power play duties, which were among the most important aspects of his job. No explanation was provided.  The other assistant coach did not experience a similar reduction in his responsibilities.

62.    In addition, the other assistant coach and the new head coach, Mike Vellucci, received new computers from The Penguins, while Mr. Skalde was the only coach left with an old and outdated one.

63.     Despite this disparate treatment, Mr. Skalde continued his superb performance through the premature end of the AHL season due to the Covid-19 pandemic – and did so without complaint.

64.     In fact, Mr. Skalde earned praise from Mr. Vellucci, who told him he had a great season and that he wished to retain him as an assistant coach for the following season.

## JOB LOSS AND FALSE ASSURANCE OF CONTINUED EMPLOYMENT

65.     Just two months later on May 5, 2020, The Penguins called Mr. Skalde to inform him that his position was being eliminated due to cutbacks necessitated by the Covid-19 pandemic, explaining that the decision was not performance-based.  That same day, The Penguins reassured Mr. Skalde that he would be retained in some role, told him he would continue on payroll through June 30 before the Covid-19 shutdown, and said that they would like to transfer him to the available Wheeling, West Virginia head coaching position, as set forth below.

66.     The Penguins' home office selected Mr. Skalde's Wilkes-Barre/Scranton position for elimination, even though Mr. Skalde had more coaching experience than the other assistant coach there, J.D. Forrest, whom The Penguins not only retained, but months later promoted to head coach of the Wilkes-Barre/Scranton Penguins.

67.     Of the 21 employees working in hockey operations for The Penguins, team management selected only Mr. Skalde for termination – and told him it had nothing to do with his performance, which was "great."  But, of course, Mr. Skalde also happened to be the only one who had complained about the unlawful sexual assault and battery of his wife by a Penguins' coach.

68.     About one week later, Mr. Vellucci called Mr. Skalde to gauge his interest in taking the head coaching position for The Penguins' ECHL affiliate, the Wheeling Nailers, a team that competes on a lower professional tier than the Wilkes-Barre/Scranton Penguins.  Mr. Vellucci and other Penguins management had mentioned this position to him as an option on the date he was told his position in Wilkes-Barre/Scranton was being eliminated.  Mr. Skalde told Mr. Vellucci that he was interested in the opportunity.

69.     Mr. Skalde was eminently qualified for the job, having won ECHL Coach of the Year honors in 2013.

70.     When Mr. Skalde contacted The Penguins' Assistant General Manager Jason Karmanos concerning the opportunity, Mr. Karmanos said only that he would put Mr. Skalde's "name in the hat" for the job.  This contrasted with the prior indications to Mr. Skalde that the job was his, if he wanted it.  It also contradicted The Penguins' established practice of preferring in-house candidates

and placing successful members of the coaching staff into available openings
without requiring them to interview or compete with outside candidates.

71.     On May 27, 2020, Mr. Skalde was formally interviewed by The
Penguins for the Nailers head coaching position.  Despite reports from some in the
Penguins' organization that he had done well in the interview and should be
selected, The Penguins informed Mr. Skalde that he had not been selected for the
job just two days later, on May 29, 2020.

72.     Instead, The Penguins selected an outside candidate who had been
coaching in Europe and had no experience with or knowledge of The Penguins
culture and organization.

73.     The Penguins later promoted Mr. Vellucci to a position with the NHL
team in Pittsburgh and promoted Mr. Forrest to head coach of the AHL team, but it
refused to recall Mr. Skalde and offer him the remaining assistant coach vacancy
despite his qualifications for the position.  With both persons promoted (Mr.
Vellucci and Mr. Forrest), The Penguins touted their experience with and
knowledge of the organization as a key to their promotions, in contrast to the
treatment of Mr. Skalde, who had similar credentials to these individuals.

74.     On information and belief, The Penguins knew before firing Mr.
Skalde and refusing to place him in another position that they intended to promote
Mr. Vellucci and Mr. Forrest, which would have left Mr. Skalde in his position as

an assistant coach in Wilkes-Barre/Scranton. Nevertheless, The Penguins created a pretext to fire Mr. Skalde, in retaliation for reporting the assault on his wife.

## COUNT I
## ASSAULT
## ERIN SKALDE v. CLARKE DONATELLI

75.    Plaintiff Erin Skalde re-alleges and incorporates by reference all allegations in the preceding paragraphs.

76.    Mr. Donatelli acted with the intent of putting Mrs. Skalde in apprehension of imminent harm and offensive bodily contact when he reached out to touch her after she resisted his sexual harassment, pulling her close to him, as well as when he moved his hands toward Mrs. Skalde's private parts on several occasions on the evening of November 11, 2018, as summarized above.

77.    As Mr. Donatelli intended, Mrs. Skalde did experience apprehension of imminent harm and offensive bodily contact.

78.    As a direct and proximate cause of Mr. Donatelli's actions, Mrs. Skalde has suffered and will continue to suffer physical and emotional pain, mental distress, and loss of enjoyment of life.

## COUNT II
## BATTERY
## ERIN SKALDE v. CLARKE DONATELLI

79.    Plaintiff Erin Skalde re-alleges and incorporates by reference all allegations in the preceding paragraphs.

80.     Mr. Donatelli caused an unwanted, offensive physical contact when, without Mrs. Skalde's consent, he engaged in the contact summarized above, pulled her close despite her resistance and telling him to stop, and groped her sexually, causing her injury, on the evening of November 11, 2018, as summarized above.

81.     As a direct and proximate cause of Mr. Donatelli's actions, Mrs. Skalde has suffered and will continue to suffer physical and emotional pain, mental distress, and loss of enjoyment of life.

### COUNT III
### NEGLIGENT RETENTION OF AN EMPLOYEE
### ERIN SKALDE v. PITTSBURGH PENGUINS

82.     Plaintiff Erin Skalde re-alleges and incorporates by reference all allegations in the preceding paragraphs.

83.     The Penguins were on notice of Mr. Donatelli's inappropriate and dangerous conduct toward women through numerous previous encounters between Mr. Donatelli and other friends, family members and staff at the Wilkes-Barre/Scranton Penguins.

84.     This inappropriate conduct included sexually harassing and assaulting other women, making crude and physical sexual advances on women while working for The Penguins, having sexual relations with lower-level staff at Mohegan Sun Arena, bringing sex workers to his hotel room on road trips,

becoming intoxicated and assaultive while attending events and road trips for The Penguins, and using drugs and alcohol, all while engaging in activities that were part of his work for The Penguins.

85.     The Penguins were fully aware of this conduct, and that it put others, especially women, at high risk of being sexually harassed and assaulted by him, and continued to tolerate, as well as support it, with expense reimbursement and a policy of encouraging such wining and dining with Penguins team members and their families.  The Penguins took no action to protect employees, family members or others who came in contact with Mr. Donatelli through his powerful position as a head coach for The Wilkes-Barre/Scranton Penguins.

86.     The sexual assault and battery that Mrs. Skalde suffered was reasonably foreseeable due to Mr. Donatelli's repeated conduct along these lines.

87.     Mr. Donatelli was acting in the scope of his employment as head coach of the Wilkes-Barre/Scranton Penguins when he committed the sexual assault of Mrs. Skalde because it occurred while on a road trip with his team and coaching staff, in which post-game dinners, drinking and socializing with the head coach were part of his job for The Penguins.

88.     While The Penguins did not have an official policy of endorsing sexual harassment, assault and battery by its coaches, it implicitly endorsed such

activity by creating, supporting and bankrolling a culture and practice in which such alcohol-fueled conduct was known to occur and went unpunished.

89.     The assault occurred within the authorized time and space limits of Mr. Donatelli's employment because it took place during a social gathering while the team was on a road trip, which Mrs. Skalde attended in support of her husband and the team, as invited by her husband's boss at The Penguins, as is custom for the families of coaches and players. The Penguins encouraged this by arranging for free tickets, expense reimbursement for dinners and drinks, and other benefits for employees and family members.  The team plays away from home 38 times per season, and families are encouraged to join the coaches on such trips.

90.     Mr. Donatelli's attendance at the team outing was actuated to serve and benefit The Penguins because, as the head coach of the Wilkes-Barre/Scranton Penguins, the gathering was intended for the coaching staff to share information and bond personally in a more relaxed environment, thereby improving team performance, with the inclusion of family members to strengthen those bonds.

91.     Because The Penguins knew about and tolerated Mr. Donatelli's lewd and harassing behavior around women, including without limitation as summarized above, his sexual assault of Mrs. Skalde was foreseeable and not in any way unexpected.

92.     As a result of Defendants' negligent retention of Mr. Donatelli, Mrs. Skalde has suffered and will continue to suffer substantial damages and harm, including without limitation, emotional distress with physical manifestations, loss of enjoyment of life, and damage to her reputation and career.

**COUNT IV**
**PENNSYLVANIA WHISTLEBLOWER LAW**
**JARROD SKALDE v. PITTSBURGH PENGUINS**

93.     Plaintiff Jarrod Skalde re-alleges and incorporates by reference all allegations in the preceding paragraphs.

94.     The Penguins (the Pittsburgh Penguins, L.P. and the Lemieux Group, L.P., as a single, joint and integrated employer) receive money from a public body to provide services in the Commonwealth, including professional hockey games, sports and entertainment, parking services for the public, and related economic activity.  The Penguins therefore are a covered employer under the law.

95.     Mr. Skalde reported, in good faith, the unlawful conduct of an employee of The Penguins organization when he complained first to Mr. Donatelli, his supervisor, and then to another supervisory employee, Mr. Guerin, about Mr. Donatelli's sexual assault and battery of Mrs. Skalde during as Penguins away game, as set forth more fully above, and his generally unlawful conduct in this manner, which continued to threaten the public and others.

96.     The Penguins retaliated against Mr. Skalde for reporting this unlawful conduct by shunning him and his wife, providing him with unequal treatment and reducing his duties as a coach, and then terminating him and refusing to place him in another available coaching job, as communicated to him on May 29, 2020 and summarized above.

97.     The Penguins justified the organization's one-man reduction in force under the pretext of staffing cutbacks in light of the Covid-19 pandemic, despite retaining all other Hockey Operations employees at the time, none of whom made a complaint of unlawful and criminal conduct to management.

98.     Despite a strong recommendation from Mr. Vellucci for an ECHL head coaching position and The Penguins' well-established preference to promote from within the organization, Penguins' management on May 29, 2020, blocked Mr. Skalde from getting the Wheeling job and appointed an external candidate with no internal knowledge of the organization. As a result, The Penguins fired Mr. Skalde, effective June 30, 2020.

99.     Also in retaliation for Mr. Skalde's protected conduct, The Penguins failed to reinstate Mr. Skalde to the vacant assistant coaching job with the Wilkes-Barre/Scranton Penguins after it became open with Mr. Forrest's promotion to head coach, as set forth above.

100.   As a result of Defendants' retaliation, Mr. Skalde has suffered and will continue to suffer substantial damages and harm, including without limitation, loss of wages and benefits, loss of future earning power, emotional distress, loss of enjoyment of life, damage to his reputation and career, and attorneys' fees and costs.

## COUNT V
## LOSS OF CONSORTIUM
## JARROD SKALDE v. PITTSBURGH PENGUINS

101.   Plaintiff Jarrod Skalde re-alleges and incorporates by reference all allegations in the preceding paragraphs.

102.   Mr. Skalde and Mrs. Skalde were married at the time Mr. Donatelli sexually assaulted Mrs. Skalde.

103.   Mrs. Skalde suffered and continues to suffer long-running emotional harm and pain as a result of Mr. Donatelli's assault and battery of her, and the way The Penguins treated her and her husband thereafter.

104.   Mrs. Skalde's emotional distress damaged Mr. Skalde's marital expectations as evidenced by a change in Mrs. Skalde's behavior around their family and other tremendous strains on their marriage.

105.   As a direct and proximate cause of Mr. Donatelli's physical and sexual assault and battery of Mrs. Skalde, and The Penguins' response thereto, Mr.

Skalde has suffered and will continue to suffer a loss of consortium with his wife, emotional pain and mental distress, and loss of enjoyment of life.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Erin Skalde and Jarrod Skalde request the following relief:

A.  An award of damages against Mr. Donatelli and The Penguins to Mrs. Skalde for physical and emotional pain and mental suffering, loss of enjoyment of life, costs of medical and psychological care, and loss of income;

B.  A judgment declaring that The Penguins violated Mr. Skalde's rights under the Pennsylvania Whistleblower Law;

C.  An award of damages to Mr. Skalde for his lost wages and benefits (back pay and front pay), loss of earning power, emotional distress damages, damage to his reputation, and loss of enjoyment of life as the result of the defendants' actions;

D.  An award of punitive damages against each of the defendants for their willful violation of the law;

E.  An award of Mrs. Skalde's and Mr. Skalde's fees and costs in this action,

including without limitation their reasonable attorneys' fees and costs;

F.    An award of pre-judgment and post-judgment interest; and

G.    Such other relief as the Court deems just and appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial on all causes of action and claims so triable.

HOMANS PECK, LLC


By:   _s/Michael D. Homans_____
      Michael D. Homans (Attorney I.D. #
      76624)
      134 North Wayne Ave.
      Wayne, PA 19087
      (215) 419-7477
Dated:  December 7, 2020    *Attorneys for Plaintiffs Erin Skalde and Jarrod Skalde*

## <u>CERTIFICATE OF SERVICE</u>

I, Michael D. Homans, hereby certify that on this 7TH day of December

2020, that a true and correct copy of the within First Amended Complaint was filed

using the Court's electronic filing system and served upon all counsel of record via

ECF notification.

_s/ Michael D. Homans_____
MICHAEL D. HOMANS
